Filed 6/14/24  P. v. Limas CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>SHAZER FERNANDO LIMAS,<br><br>    Defendant and Appellant. | G062280<br><br>(Super. Ct. No. 12CF1325)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Gary S. Paer, Judge.  Affirmed.

Melissa Hill, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General,

Christopher P. Beesley and Warren J. Williams, Deputy Attorneys General, for Plaintiff and Respondent.

*　　　*　　　*

Defendant Shazer Fernando Limas was convicted of three counts of first degree murder in the deaths of his girlfriend, Arlet Contreras, and their children, sixteen-month-old Fernando Limas and three-month-old Emmanuel Limas. (We will sometimes refer to Fernando Limas and Emmanuel Limas together as the children.) The jury made true findings as to the sentencing enhancement allegations of multiple murder.

On appeal, Limas challenges the sufficiency of the evidence of premeditation and deliberation and through that challenge, he argues his convictions for first degree murder must be reduced to second degree and the multiple murder findings must be vacated. We conclude there was substantial evidence supporting the jury's findings of premeditation and deliberation.

Limas also challenges the trial court's admission of evidence of (1) uncharged acts of domestic violence against an ex-wife and former girlfriends and (2) a party Limas threw shortly after the murders. We conclude the court did not abuse its discretion in admitting this evidence.

We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

I.

CIRCUMSTANTIAL EVIDENCE OF LIMAS'S GUILT
BEFORE ARLET'S BODY WAS FOUND

On April 25, 2012, the decomposing body of Arlet Contreras was found on a street in the La Puente area of Los Angeles County. Arlet's autopsy showed a total of 48 knife wounds; she had defensive wounds on her

2

hands and fatal wounds to the neck and chest.  The medical examiner opined Arlet had been dead for eight to ten days when her body was found.  DNA samples from the children were entered into a missing persons system from the National Center for Missing and Exploited Children.  Their bodies were never found.

Surveillance video from about 2:30 a.m. on April 25 showed a U-Haul truck making a u-turn near where Arlet's body was found.  The U-Haul truck and a refrigerator dolly had been rented by Francisco V. the morning of April 24 and were to be returned 24 hours later.  When he rented the truck, Francisco estimated he would drive 100 miles.  Francisco had rented the truck and the dolly to pick up furniture he was purchasing from Limas.

When Francisco arrived at Limas's apartment in Orange, California on April 24, Limas was acting strangely.  He had cuts on his hands, which he said he sustained in a car accident.  When Francisco tried to enter a spare bedroom in Limas's apartment, Limas said "Don't go back there."  Limas went with Francisco to unload the furniture, and then offered to drop off the U-Haul for Francisco.

The truck was returned late the next day, April 25.  The actual mileage on the truck was 331.2 miles, significantly higher than the 100 miles Francisco had estimated.  The cargo area of the truck had been cleaned, but both the refrigerator dolly and the cargo area had a bad smell that was "undescribable."  Later, pursuant to a search warrant, a cadaver dog alerted to the possible presence of human remains in the cargo area of the U-Haul truck.

Limas hired Jose Q. to clean the carpets of his apartment in April 2012.  Jose noticed a reddish stain on the carpet.  Limas told him he

3

had spilled a bottle of wine. About two days later, Limas asked Jose to help him move some furniture. Limas picked Jose up in a U-Haul truck at about 8:30 p.m. Jose noticed a bad smell in the truck, which Limas said was due to cattle. Limas drove the truck into the mountains. He stopped the truck twice and got out. They never unloaded any furniture.

Limas's mother, Patricia, regularly spoke with Arlet by phone and frequently exchanged text messages with her. She last saw Arlet and the children on an unspecified date in the clubhouse at Limas's apartment complex while Arlet and Limas were arguing. Patricia left because Limas told her not to get involved in his things. Patricia tried to call Arlet several times over the next three weeks and left messages, but never heard back from her. Patricia talked to Limas after the day she saw him and Arlet arguing, and she asked about Arlet and the children. Limas told Patricia that Arlet and the boys were okay; when Limas and Patricia had breakfast together on April 29, he was not depressed, upset, or acting suspiciously.

Arlet's mother, Mayra H., testified Arlet and the children lived with her when Arlet and Limas were not getting along. On April 12, 2012, Arlet called Mayra and asked if she could come live with her because Limas would not let her into the apartment. Mayra last spoke with Arlet the morning of April 13, 2012. Mayra continued to receive text messages from Arlet's phone. She felt something was wrong and repeatedly tried to call Arlet, but without success. Mayra sent a text message to Arlet's phone asking what was going on and received a response. Mayra testified the response said "[t]hat they were on vacation, that everything was fine; that [she was] not to be bothering her, that everything was fine."

A friend and co-worker of Limas testified Arlet called Limas frequently at work, causing "a lot of drama." About six months before Arlet

4

was murdered, Limas complained to this friend that Arlet had ruined his life, he could not afford the children, he wished Arlet was gone, and he wished he had never met her. Limas told his friend, "I hate her, I wish she did not have those kids."

Limas dated Marbeth M. from mid-2011 through spring 2012. On April 14, 2012, Limas showed up at Marbeth's apartment with several very deep cuts on his hands. He told her he had been in a fight at a restaurant. She convinced him to go to the hospital emergency room the next day, where he told the personnel he had cut himself practicing martial arts with a samurai sword. At the hospital, Limas gave a false name.[1]

Marbeth and Limas went to his apartment after dinner on April 17. Marbeth noticed the furniture in the bedroom had been moved around. Marbeth's rug was on the bedroom floor and her comforter and fitted sheet were on the bed, although she had not given Limas permission to take those things. When she visited the apartment on April 18, the furnishings in the apartment had been returned to their original positions and the apartment had been cleaned.

Marbeth attended a gathering at Limas's pool and in his apartment on April 21. That evening, Limas rented a limousine to drive the group to a club in Los Angeles. On April 23, after work, Marbeth went to Limas's apartment to help him pack his belongings in preparation for moving to her apartment. She noticed blood stains on the floor. Limas said the blood

---

[1] The individual whose name Limas used received a bill from the hospital in late April 2012, and he filed an identity theft report. This individual had worked with Limas and they were friends from 2007 through 2010. When Limas was arrested and booked into jail on May 3, 2012, he was carrying a driver's license issued in this individual's name.

came from the cuts on his hands. When she left Limas's apartment on April 24, Marbeth saw a U-Haul truck parked outside. Limas cancelled their plans for dinner later that day. The next day, April 25, Limas told Marbeth he had spent the previous night at a motel.

Video surveillance footage from the apartment complex showed Arlet and the children taking the elevator to the fourth floor (where Limas's apartment was located) at 8:13 p.m. on April 12. No video footage was found of Arlet or the children after that time.

Video surveillance footage also showed the following: On April 13 at 12:15 p.m. Limas took a dog down in the elevator, drove out of the garage, and returned about two hours later without the dog. On April 16 at 9:12 p.m., Limas's left hand was bandaged. Between 11:57 a.m. and 7:00 p.m. on April 17, Limas made multiple trips down the elevator with a number of items, including a stroller, a crib mattress, a highchair, a rolled-up rug, and a large plastic bag. On April 18, he carried plastic bags and a table down through the elevator. On April 23 and 24, Limas made many trips down the elevator with boxes, furniture, and an outdoor storage container he had purchased at Home Depot.[2]

Dayse C. had cleaned Limas's apartment on several occasions. In April 2012, Limas texted Dayse, saying he had hurt his hand doing martial arts and was at the hospital. Limas asked Dayse to clean his

_____

[2] A police officer testified at trial he had reviewed surveillance video provided by the loss prevention department at the Home Depot in Santa Ana. He observed Limas exiting the store pushing a cart containing a large outdoor storage container and a tarp. He also observed Limas pushing the cart toward a U-Haul truck parked in the Home Depot parking lot. The same officer testified the container Limas had outside the Home Depot was the same one he brought down in the apartment complex elevator.

apartment. At the apartment, Dayse noticed the bedroom furniture had been moved and the living room sofa was on the balcony. The bedroom carpet was damp and smelled of chemicals. A spot on the sofa turned a dark cinnamon color when water was applied to it. Dayse saw red spots on the walls and picture frames. Limas said the red spots were from hurting his hand doing martial arts. The cushions and bedding from the bed and kitchen knives were missing. Limas told Dayse not to clean the balcony attached to the second bedroom.

## II.

### CIRCUMSTANTIAL EVIDENCE OF LIMAS'S GUILT AFTER ARLET'S BODY WAS FOUND

On April 28, Limas informed the assistant manager of the apartment complex he was moving out, despite having only recently renewed his lease. A service technician sent to prepare the apartment for a new tenant noticed bleach stains on the carpet and a foul smell and flies coming from a storage closet on the balcony.

A carpet installer who went to Limas's apartment on May 2 to remove the old carpet noticed bleach spots on the carpet in both bedrooms, and noticed red and blue stains under the carpet he thought might be blood. The installer informed the apartment manager, who contacted the police. The police collected the old carpet and padding. Human blood was detected at several locations in the apartment, and on furnishings and pieces of carpet. Samples of the blood from the carpet were consistent with Arlet's DNA. A cadaver dog showed interest in the left bedroom closet and alerted at the balcony closet as to the presence of human remains; the police noticed "the odor of decomposition" in that closet. The complex's maintenance

7

supervisor testified the odor coming from the storage closet on the balcony was so bad they had to replace the drywall to get rid of the smell.

On May 3, Marbeth learned the police wanted to speak to her. When she asked Limas why the police wanted to speak with her, he responded, "don't call back."

Limas was arrested on May 3, 2012, following a high speed freeway chase that lasted for 38 minutes and 36 miles, during which Limas traveled as fast as 95 miles per hour. Marbeth spoke with Limas during the police chase and urged him to stop and surrender. Limas said, "I did something really bad," and "I think I might have killed someone." The chase finally ended when the California Highway Patrol used spear strips to flatten the tires on Limas's car and then used a pit maneuver to bump the car, causing it to spin and stop. A cellphone associated with Arlet's phone number was found in the truck of the vehicle; the sim card had been removed and most of the contents deleted.

Limas's ex-wife visited him in jail in October 2016 and asked him about his missing children. He told her, "they are safe," while motioning upward with his eyes. When she accused Limas of killing Arlet and the children, Limas responded that Arlet tried to stab him, and he killed her in self-defense.

### III.

#### EVIDENCE OF UNCHARGED DOMESTIC VIOLENCE

Marissa S. met Limas in 2006 at work. They dated and were married on December 15, 2007. Marissa asked for an annulment two days later, but Limas refused. In January 2008, they filled out paperwork at the courthouse to end the marriage. Limas got upset when it was time to sign the papers and walked out to the parking lot. When Marissa followed him,

Limas became very emotional, tried to talk her out of it, and held her arm so tightly he left bruises. Limas continued coming to Marissa's place of employment and calling her at work. On one occasion, when she went to the parking lot with him to keep him from coming inside, he opened the car door and tried to push her into the car. The marriage was eventually dissolved in 2011.

Linda R. dated Limas from 2007 to 2010. While they were living together, Limas was physically abusive on four or five occasions. Once, Linda asked where he was when he failed to come home, and he threw her against the wall and slapped her face, arms, and legs. On another occasion, Linda asked where he was when he failed to come home to sleep, and Limas threw her on the couch and choked her. On still another occasion, Limas threw Linda against a mirrored closet door, causing it to crack. Limas started dating Arlet while he was still seeing Linda. Limas told Linda he was physically violent with Arlet. He told Linda that Arlet had been nagging him, so he threw her across the bed when she was pregnant with their first child. In March 2012, Limas told Linda that Arlet and the children were "kind of, sort of, not really" living with him. On several occasions, Limas told Linda he was going to send Arlet and the children to Mexico and that Arlet would be leaving soon.

Diana A. and Limas began dating in 2008 and had a child together in 2009. After a party, Limas dragged Diana into an underground parking lot and threw her hard against the wall. Limas then came at Diana's neck with his hands. Limas then acted as if nothing had happened. Back at Limas's apartment, as Diana began gathering her things, Limas grabbed her and threw her against the bed, and said, "you're not leaving." When Diana tried to walk out the door, Limas threw her even harder, causing her to

9

bounce off the bed into the dresser and onto the floor. Diana sat on the floor because she was pregnant and feared she would have a miscarriage. Diana did not call the police because she did not have legal status. Later, when Limas appeared to have fallen asleep, Diana fled to her car. Limas, however, was not asleep and chased her down the hallway and tried to pull her back into the apartment. Diana made it to her car, but Limas appeared in the car window, yelling. He first apologized and then started threatening her. Diana drove from Limas's apartment to her family's home in San Diego. It was about 4:00 a.m. She could see Limas's car approaching from behind at a high rate of speed. Limas hit her car on the left side.

IV.

PROCEDURAL HISTORY

Limas was charged with three counts of murder. (Pen. Code, § 187, subd. (a).) As to all three counts, the information alleged a special circumstance of multiple murder. (*Id.*, § 190.2, subd. (a)(3).) The jury convicted Limas on all three counts, determined the murders were in the first degree, and found the special circumstance allegations to be true. The trial court sentenced Limas to three consecutive life sentences without the possibility of parole. Limas filed a timely notice of appeal.

DISCUSSION

I.

SUBSTANTIAL EVIDENCE OF PREMEDITATION AND DELIBERATION

Limas argues substantial evidence does not support the jury's findings of premeditation and deliberation, requiring that the first degree murder convictions be reduced to second degree and that the multiple murder findings be vacated. "Upon a challenge to the sufficiency of evidence for a jury finding, we "'"review the whole record in the light most favorable to the

10

judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'"'" [Citation.] 'The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence.'" (*People v. Rivera* (2019) 7 Cal.5th 306, 323–324.)

Murder is of the first degree when it is willful, deliberate, and premeditated. (Pen. Code, § 189, subd. (a).) "'"A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.] 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance. [Citations.]" [Citation.] '"Premeditation and deliberation can occur in a brief interval. "The test is not time, but reflection. 'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly."'"'" (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1068–1069.)

"The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing

11

from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2). [¶] Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (*People v. Anderson* (1968) 70 Cal.2d 15, 26–27.) Using the *People v. Anderson* analysis as a guide, we conclude the appellate record contains substantial evidence of premeditation and deliberation.

First, the record contains evidence of Limas's planning activity. In April or May 2011, Limas asked a former girlfriend "about a hit man." In December 2011, Limas told a friend Arlet had ruined his life and he could not afford "all these kids." Of Arlet, Limas stated: "I wish she was gone. I wish I never met her." In February or March 2012, Limas told his then-girlfriend it was "too dangerous" to spend time at his apartment because of Arlet, but said, "Don't worry, I'm taking care of things." Limas told another girlfriend "if [she] were to consider taking him back that [Arlet] would [not] be a problem anymore." In March 2012, another ex-girlfriend asked Limas if Arlet and the children were currently living with him; he replied, "Kind of, sort of, not really," and "he was going to send her and the kids to Mexico, that she's going to be leaving soon to Mexico." On Friday, April 13, 2012, Limas left his apartment with his dog, and returned about two and one-half hours later without the dog, which the Attorney General suggests indicated Limas was planning to murder Arlet and the children, and knew it would "become violent and messy."

12

Second, there was substantial evidence of Limas's motive to murder Arlet and the children because they restricted his ability to live his life as he desired. Six months before the murders, a friend heard Limas say, "Arlet has ruined his life. He talked about he can't afford all these kids. And she keeps getting pregnant. I wish she was gone. I wish I never met her." The friend also testified Limas had said things like, "'I hate her, I wish she did not have those kids.'"

Limas had specifically denied having kids to a girlfriend, and he had no photographs of the children and nothing in his apartment for the children, including clothing or toys. He told a girlfriend, "it was too dangerous to go to his place right now, that you know, we have to wait some time. Don't worry, I'm taking care of things." Another girlfriend had sent a text about Limas reading: "I was on the phone with him while the cops were chasing him. He has been [stalking] me for a long time. I have messages, E-mails, and texts to prove it. He told me if I were to consider taking him back that she would [not] be a problem anymore. I didn't think that he would go to that extreme. He even called me from jail." The evidence supported a finding that Limas believed Arlet and his children restricted his ability to live his life as he wished, therefore creating strong motivation to permanently remove them from his life.

Third and finally, the manner of the killing supports the finding of premeditation and deliberation. Limas stabbed Arlet 48 times; the majority of the wounds were to her neck, chest, and upper back, including fatal wounds to the carotid artery, jugular vein, lungs, aorta, and heart. (See *People v. Morales* (2020) 10 Cal.5th 76, 102 [evidence of multiple stab wounds to victims' neck or chest bears "most directly" on whether the defendant acted with premeditation and deliberation]; *People v. Elliot* (2005) 37 Cal.4th 453,

471 [three potentially lethal knife wounds plus almost 80 other stab and slash wounds is evidence of "preconceived design to kill"]; *People v. San Nicolas* (2004) 34 Cal.4th 614, 658–659 [multiple stab wounds on the victim's body support finding of deliberation]; *People v. Pride* (1992) 3 Cal.4th 195, 247 ["violent and bloody death sustained as a result of multiple stab wounds can be consistent with a finding of premeditation"]; *People v. Moore* (2002) 96 Cal.App.4th 1105, 1114 [stabbing victim in abdomen rather than arm or leg supports finding the defendant acted willfully and with deliberation and premeditation].)

Moreover, if Limas killed Arlet first, then he had ample opportunity to reflect on his actions before killing the children; the reverse is also true. (*People v. Potts* (2019) 6 Cal.5th 1012, 1028 [evidence of premeditation and deliberation as to the second victim was "particularly strong" where the defendant had to track her through the house after killing the first victim].)

The record also contains substantial evidence of Limas's consciousness of guilt after the murders supporting the finding of premeditation and deliberation. (*People v. Perez* (1992) 2 Cal.4th 1117, 1128 [jury may consider actions by the defendant after the killings that are inconsistent with rash, impulsive killing to establish premeditation and deliberation].) After the murder, Limas used Arlet's cellphone to text Arlet's mother "[t]hat they were on vacation, that everything was fine" and that she should not be "bothering her," because "everything was fine."

Limas concealed evidence of the murders by attempting to remove the blood stains with bleach. Limas explained the severe cuts to his hands by claiming he had been in a fight at a restaurant and telling an emergency room technician he had an accident while practicing with a

14

martial arts or samurai sword. At the emergency room, Limas used an ex-coworker's identification card rather than using his own name to hide his identity. The appellate record lacks any evidence that Limas was upset or grieving at any time. While the bodies of Arlet and/or the children were decomposing in a balcony closet, Limas invited people to his home to watch a UFC fight on television, after which they went to a club in Los Angeles in a limousine.

Limas also demonstrated consciousness of guilt by disposing of the bodies of Arlet and the children. Limas dumped Arlet's body in a commercial area late at night. The jury could have concluded Limas removed the children's bodies from his apartment in trash bags or boxes, either placing them in the complex's dumpster or transporting them to a remote location; at the same time he removed all items needed for the children (such as bouncer seats, strollers, and crib mattresses) from the apartment.

## II.

### ADMISSION OF EVIDENCE OF DOMESTIC VIOLENCE AGAINST OTHER WOMEN

Limas argues the trial court erred by admitting evidence regarding incidents of domestic violence by Limas against his former girlfriends. He contends the admission of this evidence violated his right to due process and that the evidence had no probative value because the incidents were dissimilar, the probative value was outweighed by the danger of undue prejudice, and the evidence resulted in an undue consumption of time and was cumulative.

Character evidence is generally inadmissible to prove a defendant's conduct on a particular occasion. (Evid. Code, § 1101, subd. (a).) However, a defendant's acts of domestic violence are admissible to show propensity to commit other acts of domestic violence. (*Id.*, § 1109,

15

subd. (a)(1); see *People v. Brown* (2011) 192 Cal.App.4th 1222, 1240 [evidence of previous acts of domestic violence admissible in murder trial].)  The admission of evidence under Evidence Code section 1109 is governed by Evidence Code section 352:  "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (*Ibid.*)  Therefore, we review the trial court's admission of evidence regarding Limas's previous acts of domestic violence for abuse of discretion.  (*People v. Mani* (2022) 74 Cal.App.5th 343, 358.)

Before trial, the district attorney filed a motion to introduce evidence of Limas's past acts of domestic violence.  (Evid. Code, §§ 1109, 1101, subd. (b), 352.)  The district attorney identified four women who were ex-wives or ex-girlfriends who would testify against Limas.  Limas filed a motion to exclude "any reference to acts or instances of violence committed by Mr. Limas in prior relationships.  This would be inadmissible character evidence."  The court permitted the district attorney to offer the testimony of three of the women,[3] and gave the following limiting instruction immediately after two of those witnesses testified:  "At the end of the trial I will read you a whole bunch of law.  There is also an instruction called [a] limiting instruction.  In other words, some evidence came before you and I need to tell you how you are to consider it.  So that is why it's somewhat limiting.  Some evidence comes in before a jury, there's only certain things you can do with it.  Then there are certain things that you can't do with it.  [¶]  That is why they call it generally a limiting instruction to give the jury guidance on how you're

_____

[3]  The district attorney elected not to call the fourth woman to testify.

16

supposed to handle or evaluate this evidence. Well, the last two witnesses they testified about a topic involving domestic violence. So you heard about this. We call it uncharged domestic violence because those occurrences are not per se charges in this case, but you heard about them anyway. [¶] So I want to read you a limiting instruction on how you're supposed to take this evidence into consideration. I'm going to read you a portion of this, and it's a good time to read it because you just heard from Linda R. and Diana A. At the end of the case I'm going to give you more detail on this issue, but I want to highlight the main theme of this. This is from [CALCRIM No.] 852(a). [¶] . . . [¶] If you decide that the Defendant committed the uncharged domestic violence, you may but are not required to conclude from that evidence that the Defendant was disposed or inclined to commit domestic violence and based on that decision also conclude that the Defendant was likely to commit and did commit murder as charged here. [¶] If you conclude that the Defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the Defendant is guilty of murder. The People must still prove each charge and allegation beyond a reasonable doubt. Do not consider this evidence for any other purpose unless I tell you otherwise when the case ends."

Before deliberations, the trial court gave the jury the following limiting instruction from CALCRIM No. 852A: "You may consider this evidence [of uncharged domestic violence] only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged domestic violence. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more

17

likely than not that the fact is true.  [¶]  If the People have not met this burden of proof, you must disregard this evidence entirely."

Limas first argues the admission of propensity evidence under Evidence Code section 1109 violates due process.  Following *People v. Falsetta* (1999) 21 Cal.4th 903, 917, in which the Supreme Court held Evidence Code section 1108 did not violate due process, the courts of this state consistently have rejected this claim.  (See *People v. Mani, supra*, 74 Cal.App.5th at pp. 373–376; *People v. Merchant* (2019) 40 Cal.App.5th 1179, 1194; *People v. Brown* (2011) 192 Cal.App.4th 1222, 1233, fn. 14; *People v. Johnson* (2010) 185 Cal.App.4th 520, 529; *People v. Reyes* (2008) 160 Cal.App.4th 246, 251; *People v. Cabrera* (2007) 152 Cal.App.4th 695, 704; *People v. Escobar* (2000) 82 Cal.App.4th 1085, 1096; *People v. Brown* (2000) 77 Cal.App.4th 1324, 1334; *People v. Johnson* (2000) 77 Cal.App.4th 410, 419.)

Limas next argues the probative value of the evidence of domestic violence against other women was outweighed by the risk the evidence would create a substantial danger of undue prejudice, confusion of the issues, misleading the jury, and undue consumption of time.

In *People v. Brown, supra*, 192 Cal.App.4th at page 1237, the appellate court held evidence of the defendant's acts of domestic violence against the murder victim as well as against four women he dated before the murder victim were admissible under Evidence Code section 1109:  "[T]he facts and circumstances of defendant's relationship with Bridget were indicative of defendant's "'larger scheme of dominance and control'" which he attempted to exercise over Bridget as he became angry, watched her activities, followed her, and tried to prevent her from having any other relationships.  [Citation.]  Defendant's prior acts of domestic violence, committed against the four women he dated before Bridget, were also

18

indicative of 'cases where perpetrators of this violence will beat their intimate partners, even kill them, and go on to beat or kill the next intimate partner.' [Citation.] [¶] . . . [¶] . . . [A] defendant's propensity to commit domestic violence against a former girlfriend who was murdered, and other prior girlfriends who were assaulted, is relevant and probative to an element of murder, 'namely, [defendant's] intentional doing of an act with malice aforethought that resulted in the victim's death.' [Citation.] A defendant's pattern of prior acts of domestic violence logically leads to the inference of malice aforethought and culpability for murder." (*People v. Brown*, at p. 1237.)

The testimony of these witnesses established Limas's pattern of choking, hitting, exerting dominance over, and throwing women he was dating or to whom he was married. This evidence tended to establish Limas's propensity to commit such acts against Arlet. Additionally, Limas's pattern of committing acts of domestic violence leads in this case to an inference of malice and of willfulness, premeditation, and deliberation. The trial court did not abuse its discretion by admitting testimony from these witnesses.

### III.

#### EVIDENCE OF HOSTING A PARTY DAYS AFTER THE MURDERS

Limas argues the trial court abused its discretion by admitting evidence he hosted a gathering at his home just days after the murders of Arlet and the children. This, too, is reviewed for abuse of discretion. ""A trial court has 'considerable discretion' in determining the relevance of evidence. [Citation.] Similarly, the court has broad discretion under Evidence Code section 352 to exclude even relevant evidence if it determines the probative value of the evidence is substantially outweighed by its possible prejudicial effects."' [Citation.] Evidence is relevant when it ""tends

19

"logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive.'" [Citation.] We review the trial court's evidentiary decision for abuse of discretion, disturbing it only if we conclude that the trial "'"'"court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.'"'"'" (*People v. Parker* (2022) 13 Cal.5th 1, 53.)

Limas argues the evidence was highly prejudicial and lacked any probative value. The Attorney General argues this evidence demonstrated Limas's suppression of evidence after committing the murders, as well as his intent.

In response to Limas's motion in limine to exclude references to an "alleged gathering" at his home for a UFC fight on April 21, 2012, the district attorney argued the evidence was relevant to show Limas did not act in self-defense or that the murders were an accident, and to show his planning and malice. Additionally, individuals present at the gathering noticed furniture was out of place, which the district attorney contended showed Limas was trying to suppress or hide evidence by covering up blood stains or other evidence of the crimes. The trial court denied the motion in limine.

Limas's counsel raised the objection again during trial. The district attorney responded: "Everything he did between the time of the date of the murder to the time he was arrested is relevant because his guilt is still at issue. He has not admitted to killing the three individuals charged in this case. So the alternatives are that at least with respect to the kids, either the kids are missing, his kids are missing, or someone else killed his kids. His behavior is inconsistent with that . . . of someone who is remorseful, who is sad, who is in agony. Anything inconsistent with that is relevant.

20

Everything he did.  It's not just this party.  He went to clubs.  He had dinners.  He acted a normal life while either his kids were dead or missing." The trial court concluded the probative value of the evidence outweighed any prejudice, as it tended to indicate through circumstantial evidence the murders had been committed in the apartment, necessitating the movement of furniture and attempts to clean the apartment.

We agree with the trial court's analysis.  Limas's behavior was inconsistent with someone whose girlfriend and children were missing. Alternatively, if Limas killed his girlfriend and his own children, hosting a party in his home, where the crimes occurred and the bodies were hidden and decomposing, reflects malice, willfulness, deliberation, and premeditation. Further, the movement of furniture was probative of Limas's attempts to hide evidence of the murders.

IV.

CUMULATIVE ERROR

Finally, Limas argues that the claimed errors addressed in parts II and III above had the cumulative effect of creating such prejudice that reversal is required.

Multiple trial errors may, indeed, have a cumulative effect. (*People v. Hill* (1998) 17 Cal.4th 800, 844–848.)  In a close case, the cumulative effect of these errors may require reversal where "it is reasonably probable" they affected the verdict.  (*People v. Wagner* (1975) 13 Cal.3d 612, 621.)  Where all or nearly all of the individual claims of error are rejected, however, we will not reverse based on a theory of cumulative error.  (*People v. Bradford* (1997) 14 Cal.4th 1005, 1057.)

21

DISPOSITION

The judgment is affirmed.


GOODING, J.

WE CONCUR:


O'LEARY, P. J.


SANCHEZ, J.